2024 IL App (4th) 240747

NO. 4-24-0747

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* J.C., a Minor, | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Tazewell County |
| v. | ) | No. 20JA232 |
| Alexa C., | ) | |
| | ) | Honorable |
| Respondent-Appellant). | ) | David A. Brown, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Lannerd and Vancil concurred in the judgment and opinion.

## OPINION

¶ 1 In September 2022, the State filed a petition to terminate the parental rights of respondent, Alexa C., to her minor child, J.C. (born July 2020). Respondent stipulated to a finding of unfitness, and following a best interest hearing, the trial court granted the State's petition and terminated respondent's parental rights. On appeal, respondent argues the court erred by permitting testimony that violated her due process rights. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3 In August 2020, the State filed a shelter care petition pursuant to the Juvenile Court Act of 1987, contending J.C.'s environment was injurious to his welfare (705 ILCS 405/2-3(1)(b) (West 2020)). The petition alleged respondent (1) was found unfit in Tazewell County case No.

18-JA-129, (2) had failed to submit to random drug screenings, and (3) refused to reveal the identity of J.C.'s father. The trial court entered an order placing J.C. in the temporary custody of the Illinois Department of Children and Family Services (DCFS).

¶ 4        Following a hearing in April 2021, the trial court entered an adjudicatory order finding J.C. was abused or neglected as alleged in the petition. That same day, the court entered a dispositional order finding respondent unfit for reasons other than financial circumstances alone to care for J.C. The court made J.C. a ward of the court and granted custody and guardianship to DCFS. The court ordered respondent to cooperate with DCFS and comply with specific terms as directed by DCFS.

¶ 5        In September 2022, the State filed a petition to terminate respondent's parental rights. The petition alleged respondent had failed to make reasonable progress toward the return of J.C. to her care within nine months after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2022)). The State defined the relevant nine-month period as November 1, 2021, to August 1, 2022. Respondent filed an answer denying the allegations contained in the State's petition.

¶ 6                                    A. Fitness Hearing

¶ 7        In July 2023, the trial court held a hearing on the State's petition to terminate respondent's parental rights. At the hearing, respondent changed her answer to the petition and stipulated to the allegations of unfitness. The State provided a factual basis that respondent was ordered to complete a substance abuse assessment and parenting classes, participate in counseling, and comply with drug screenings three times per month, along with random drug screenings. According to the State, from November 1, 2021, through February 2022, respondent did not complete drug treatment, nor did she comply with any drug screenings. From February 2022 through August 1, 2023, respondent did not attend any visitations with J.C., complete drug

treatment, or comply with any drug screenings. (We note although the State's proffer indicated respondent failed to complete substance abuse treatment, the record shows she had failed to complete a substance abuse assessment, so it is unclear if any treatment was recommended or ordered.) Additionally, the State proffered respondent was involved in several encounters with law enforcement. Respondent was involved in a domestic dispute in December 2021 wherein she had visible injuries and indicated she had been arrested for domestic battery in November 2021. Police were called on January 1, 2022, regarding an apparent overdose of prescription medication involving respondent. On January 19, 2022, police responded to an incident involving respondent and her mother wherein respondent attempted to take prescription medication from her mother while she was holding J.C. On May 26, 2022, respondent was screaming loudly and using profanity in the courthouse. When officers attempted to control respondent, who was being combative, she bit a deputy on his bicep. In May 2023, respondent was arrested for residential burglary, and then later for aggravated battery.

¶ 8       The trial court found the State's factual basis was sufficient to find by clear and convincing evidence respondent failed to make reasonable progress within the nine-month period as alleged. The matter was then continued for a best interest hearing.

¶ 9                        B. Best Interest Hearing

¶ 10       Prior to the best interest hearing, the State filed a motion for leave to issue drug court probation officer Nick Carlton a subpoena *duces tecum* for "all mental health/counseling records" and "all drug court notes." The trial court granted the release of "all drug treatment records/drug testing results, any assessments and any and all drug court notes" regarding respondent. On April 16, 2024, the court conducted a best interest hearing. A best interest report

prepared by caseworker Andrea Wilson was received and considered without objection, additions, or corrections by the parties.

¶ 11 The best interest report showed J.C. had been in substitute care with three different placements. He began with his maternal grandmother but was removed from her care in April 2022 because respondent had twice taken J.C. from the grandmother's care without the consent of DCFS or the grandmother. J.C. was removed from the substitute care of his maternal aunt in February 2024, after a DCFS investigation indicated "prescription drug use" and improper visitation by J.C.'s biological parents. Since February 5, 2024, J.C. had been placed in a licensed foster home.

¶ 12 J.C.'s basic needs were being met with his current foster placement. He had begun to bond with his new foster parent and was bonded to the other children in the home. J.C. attended day care and was awaiting services for speech therapy. He was current on his immunizations but was experiencing gastrointestinal issues for which he was referred to a specialist as a precautionary measure.

¶ 13 Respondent completed a parenting course in April 2021. She completed outpatient substance abuse treatment in September 2023. Respondent had participated in drug court probation since August 2022. The report indicated concerns about respondent's "criminal history, domestic violence, theft, and possession of controlled substances." In August 2021, respondent attempted to "kidnap" J.C. from his grandmother's home by taking J.C. to her home and refusing to answer the door for the police. In February 2022, respondent again removed J.C. from his grandmother's home and tried to convince police she had regained custody of him. In May 2022, respondent had an outburst in court and become physically violent with multiple police officers, including biting and kicking officers. She was taken to a hospital, where she tested positive for amphetamines. On January 1, 2022, respondent sent concerning text messages to her mother, who called a family

- 4 -

friend to check on her. Respondent was found unresponsive after taking multiple doses of prescription medications. Later that same month, respondent was arguing with her mother and seeking hydrocodone. Respondent had tested positive for methamphetamine in April and September 2023. Respondent had obtained employment and housing.

¶ 14 Respondent had missed a supervised visit with J.C. in February 2024 due to oversleeping. According to Wilson, respondent demonstrated appropriate parenting skills during visits with J.C. Respondent accompanied the foster parent to one of J.C.'s medical appointments and followed up with the foster parent when informed J.C. was sick. She had also provided the foster parent with pertinent information about J.C.

¶ 15 Wilson testified she had been assigned to J.C.'s case since January 2024. Her testimony was consistent with the best interest report she had prepared. Wilson also stated J.C.'s current foster parent was very attentive and "very bonded" with him. Since his new placement, J.C. has "thrived," and his medical and social needs were being met.

¶ 16 Leslie Gard testified she was the assigned caseworker and supervisor for respondent's case from October 2020 through February 2022. Gard believed respondent was using "substances" during this period. Gard described two kidnapping instances involving respondent. In August 2021, respondent, who was not the guardian for J.C., visited J.C. at respondent's mother's home. Respondent proceeded to take J.C. from her mother's home to her apartment and barricaded herself inside. In February 2022, respondent again removed J.C. from his caregiver's home. Gard agreed respondent's unsupervised visits with J.C. posed a safety risk.

¶ 17 Carlton testified he was a drug court officer with the Tazewell County probation office. Respondent had been enrolled in the Tazewell County drug court program since August 2022. The State asked Carlton if respondent had used a substance called kratom. Carlton

responded, "So this is where, Judge, I have to ask if them being in Drug Court if it's okay to answer questions about," to which the trial court stated, "The Court will order you to respond to the questions that are asked at that point." Thereafter, Carlton answered, without objection from respondent, that she admitted to using kratom in April 2023 and tested positive for kratom in April 2024. Carlton noted the positive test for kratom had reset her sobriety date. Respondent had missed drug screenings and had failed to appear in drug court, causing a warrant for her arrest to be issued. Respondent tested positive for methamphetamine in April 2023.

¶ 18　　　　Justin Stump testified he was Carlton's supervisor and was familiar with respondent from drug court. Stump confirmed respondent tested positive for kratom in April 2024. She also tested positive for benzodiazepines.

¶ 19　　　　Respondent testified she had obtained an apartment, where she had lived alone for the past four months. She was employed with DoorDash. J.C. would have his own room with toys and clothes. Respondent said she had celebrated J.C.'s birthday and notable holidays with him. She stated J.C. was bonded to his older brother. Respondent stated she had been sober from methamphetamines for a year and a half. She attended drug rehabilitation in November 2022 and was currently participating in drug court. She admitted to testing positive for kratom, which is legal in Illinois but was a violation of her drug court participation. She expected to graduate from drug court in November 2024 and did not believe her recent positive test for kratom affected her eventual graduation.

¶ 20　　　　On cross-examination, respondent stated she had been sober since October 14, 2022. When questioned about testing positive for methamphetamine in April 2023, she stated she had not used methamphetamine and her doctor believed the positive result was related to her Graves' disease diagnosis.

¶ 21	The guardian *ad litem* (GAL) for J.C. recommended respondent's parental rights be terminated. The GAL noted J.C. had been alive for 1377 days and only for "48 of those days he has not been in substitute ca[r]e." Respondent had "kidnapped" J.C. twice, he was thriving in his current placement, and despite no indication of his current foster parent adopting him, the GAL believed J.C. would be adopted and the need for permanency was a paramount consideration.

¶ 22	The trial court began by noting J.C. had been in substitute care since August 25, 2020, which was six weeks after he had been born and nearly four years prior to the hearing. The court found it "particularly disturbing" that respondent knew her sister—while she was caring for J.C.—had been using substances but did not take action; rather, respondent "used that information for [her] own benefit or attempted to basically threatening to—to out her if she were [to] testify negatively against [her]." Respondent was aware kratom was not permitted in drug court but continued to use it anyway. Furthermore, respondent had "kidnapped" J.C., and her portrayal of drug court success was inaccurate.

¶ 23	When reviewing the best interest factors, the trial court noted, for the physical safety and welfare of J.C., respondent had demonstrated "some ability to do that." The court noted J.C.'s identity was tied to respondent's side of the family and his background and ties weighed against termination. J.C.'s sense of attachment was "neutral." His security and familiarity were minimal given his short-term placement with his new foster parent. The court considered J.C.'s new foster parent to be a short-term placement. Due to his age, J.C. had not expressed wishes or long-term goals and his ties to the community were not substantial.

¶ 24	The trial court emphasized J.C.'s need for permanency, stability, and continuity of relationships was substantial, noting that just a month and a half of stability with his new foster parent showed potential for his development. The court stated respondent could not provide

stability sufficient to continue J.C.'s development. The court found the State had proven by a preponderance of the evidence it was in J.C.'s best interest to terminate respondent's parental rights.

¶ 25    This appeal followed.

¶ 26                              II. ANALYSIS

¶ 27    On appeal, respondent argues the trial court erred by admitting the testimony of Carlton and Stump at the best interest hearing. Respondent does not challenge the court's unfitness finding. Accordingly, we confine our review to the best interest hearing.

¶ 28    Respondent contends the trial court violated her right to due process when it allowed the State to obtain and utilize her drug court participation and confidential information at the best interest hearing without her voluntary and express written consent. Respondent cites the Problem-Solving Courts Standards manual promulgated by the Illinois Supreme Court pursuant to the Drug Court Treatment Act (730 ILCS 166/1 *et seq.* (West 2022)). The State argues respondent forfeited this issue by failing to object to the testimony of Carlton and Stump at the best interest hearing and failing to raise the issue in a posttrial motion.

¶ 29    Generally, an issue that was not objected to during trial and raised in a posttrial motion is forfeited on appeal. *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26; see *In re William H.*, 407 Ill. App. 3d 858, 869-70 (2011) ("It is well established that, to preserve an alleged error for appellate review, a party must, even in child custody cases, object at trial and file a written posttrial motion addressing it."). In the case *sub judice*, respondent did not object to the testimony of Carlton or Stump. Respondent did not raise the issue again following the best interest hearing prior to filing an appeal. Accordingly, we find respondent has forfeited this issue.

¶ 30 Alternatively, respondent asks this court to review this issue under the plain-error doctrine. Because termination of parental rights affects a fundamental liberty interest, a court of review may consider whether a forfeited issue constituted plain error. *In re L.B.*, 2015 IL App (3d) 150023, ¶ 11. The plain-error doctrine may be applied "in civil cases only where the act complained of was a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process." (Internal quotation marks omitted.) *In re Marriage of Saheb*, 377 Ill. App. 3d 615, 627 (2007).

¶ 31 For the reasons that follow, we find a clear error occurred when the trial court permitted the State to subpoena respondent's drug court records and permitted Carlton and Stump to testify about her drug court participation. However, we conclude the error was not so egregious as to deprive respondent of a fair hearing or substantially impair the integrity of the judicial process.

¶ 32 The crux of respondent's argument on appeal is that the testimonies of Carlton and Stump revealed highly confidential details of her drug use, sanctions for infractions committed while she was in the drug court program, and other prejudicial information that is strictly prohibited by the Problem-Solving Courts Standards. The standards state:

> "A [problem solving court (PSC)] participant's confidential information *shall* not be obtained from a PSC to be *utilized* in other proceedings, civil or criminal, *involving* the PSC participant or with regard to another person, unless the PSC participant has given voluntary and express written consent for the redisclosure of the confidential information." (Emphases in original.) Supreme Court of Illinois, Administrative Office of the Illinois Courts, Problem-Solving Courts Standards § 7.4(e) (rev. 2019), https://www.illinoiscourts.gov/Resources/a4b9d77c-b014-

4174-b011-21a4ccd90521/PSC_Standards_2019.pdf    [https://perma.cc/PLW7-CAPP].

¶ 33    The record demonstrably reveals the Problem-Solving Courts Standards were violated when the trial court permitted the State to subpoena respondent's drug court records and permitted Carlton and Stump to testify about their observations of respondent's conduct while in drug court. We do not condone what occurred and directly admonish trial courts that such actions are antithetical to the purposes of problem-solving courts, such as a drug court, to effectively serve local communities.

¶ 34    However, the record also shows the trial court did not reference either Carlton's or Stump's testimony when reaching its determination. The alleged prejudicial information from their testimonies is largely that respondent had missed some drug screenings, had been late to drug court appearances, consumed kratom in April 2023 and April 2024, and consumed benzodiazepines in April 2024. If this information—gleaned from the testimonies of Carlton and Stump—is disregarded from the record, it does not change the fact that respondent had failed to submit to drug screenings as directed by DCFS and that respondent herself had admitted to consuming kratom. Additionally, the best interest report showed she had tested positive for methamphetamine twice in 2023.

¶ 35    While the trial court briefly commented that respondent's apparent success in drug court was illusory, it had relied on evidence from the best interest report and the testimonies of Wilson and Gard—which are not challenged on appeal—for the bulk of its findings. Specifically, the court had noted respondent had twice removed J.C. from substitute care without authority and withheld information for her own benefit about her sister's substance abuse while she was caring for J.C. The court also relied on its analysis and application of the statutory best interest factors.

Given Carlton's and Stump's testimonies provided *de minimis* support to the court's best interest findings, we conclude their testimonies were not *so egregious* that it deprived respondent of a fair hearing and substantially impaired the integrity of the judicial process.

¶ 36 Respondent does not advance an argument as to how the remainder of the trial court's best interest findings were against the manifest weight of the evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33 (stating a reviewing court will only reverse the trial court's best interest determination if it is against the manifest weight of the evidence); see *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379 (1978) (stating, aside from jurisdictional grounds, a reviewing court should not search the record for unargued or unbriefed reasons to reverse a trial court's judgment). Accordingly, we conclude the court's determination that terminating respondent's parental rights was in J.C.'s best interest was not against the manifest weight of the evidence.

¶ 37                                    III. CONCLUSION

¶ 38          For the reasons stated, we affirm the trial court's judgment.

¶ 39          Affirmed.

*In re J.C.*, 2024 IL App (4th) 240747

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Tazewell County, No. 20-JA-232; the Hon. David A. Brown, Judge, presiding. |
| **Attorneys for Appellant:** | Samuel L. Snyder, of Pekin, for appellant. |
| **Attorneys for Appellee:** | Kevin E. Johnson, State's Attorney, of Pekin (Patrick Delfino, David J. Robinson, and James C. Majors, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |